IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


Linda S. Harlan,                          :

                    Plaintiff            :        Civil Action 2:11-cv-320

        v.                               :        Judge Graham

Commissioner of Social Security,          :        Magistrate Judge Abel

                    Defendant            :


## Report and Recommendation

Plaintiff Linda S. Harlan brings this action under 42 U.S.C. §405(g) for
review of a final decision of the Commissioner of Social Security denying her
application for a period of disability and disability insurance benefits. This case is
now before the Magistrate Judge for a report and recommendation on the
disposition of this matter.

**Summary of Issues**. Plaintiff Harlan filed an application on February 22,
2006 for a period of disability and disability insurance benefits, alleging that she
had become disabled on March 5, 2004, at the age of 44, by a spinal injury,
depression, and human papillomavirus. The administrative law judge ("ALJ")
found that Plaintiff retains the ability to perform a limited range of light work
comprising simple, repetitive tasks in a low stress work environment with only
superficial contact with others. Plaintiff argues that the decision of the Commiss-
ioner denying benefits should be reversed because the ALJ failed in forming her

residual physical capacity opinion to include a requirement that she change positions at least every half hour, and failed in forming her mental physical capacity opinion to take into account Plaintiff's decreased stress tolerance.

**Procedural History**.  Plaintiff Linda S. Harlan filed her application for a period of disability and disability insurance benefits on February 22, 2006, alleging that she had been disabled since March 5, 2004 by a spinal injury, depression, and human papillomavirus.  (R. 50.)  The application was denied initially and upon reconsideration.  Plaintiff sought a *de novo* hearing before an administrative law judge.  On April 16, 2009, an administrative law judge held a hearing at which Plaintiff, represented by counsel, appeared and testified.  (R. 630.)  A vocational expert also testified at the hearing.  On June 1, 2009, the administrative law judge issued a decision finding that Plaintiff was not disabled within the meaning of the Act.  (R. 16-26.)  On February 12, 2011, the Appeals Council denied Plaintiff's request for review and adopted the administrative law judge's decision as the final decision of the Commissioner of Social Security.  (R. 4.)  She thereupon filed this appeal.

**Age, Education, and Work Experience**.  Plaintiff was born on September 7, 1959.  (R. 25.)  She graduated from high school in 1977, and worked as a book-keeper or controller for three different firms between 1977 and 2004.  (R. 51, 57.) In her last position she was hired in May 2003 and terminated in March 2004. According to her application for benefits, Plaintiff was nominally discharged as

redundant, but she believed that her boss disliked her. (R. 51.) At the hearing, she testified that she had left her job because she had suffered a nervous breakdown. (R. 647.)

**Plaintiff's Testimony**. The administrative law judge summarized Harlan's testimony at the hearing as follows:

> The claimant testified that [on] a typical day she gets up between 6:30-7:00 a.m. to get her daughter ready for school and make breakfast. She walks her daughter about a block to the bus stop and comes home. She will get on the computer for up to 45 minutes, watch some television and then takes a one to two hour nap. She gets up, has something to eat and then goes back to the computer for about an hour or so. She describes spending about three hours a day on the computer, total. She spends about two hours a day in her "anti-gravity" chair. She reads. She occasionally goes to the mall with her daughters or out to eat. She has taken her daughter to activities such as skating, bowling and the movies and she sits on the sidelines, but it is uncomfortable to sit for more than an hour. As for hobbies, she testified that she reads and collects crystals off the internet, but she also described to her mental health source that she does crafts such as making jewelry and hand lotion. She describes some difficulty with household chores, but it should be noted that the claimant's description of the difficulty lends itself more from her physical complaints than her mental impairments. She is able to care for her own personal grooming, hygiene and dressing. She cooks, drives and is able to go grocery shopping.

> The claimant is married with three children. She lives in a two-story home with her husband and her youngest child. She describes using the stairs once a day. She drives approximately three times a week, going to the grocery store, doctor appointments or taking her daughter to/from school as needed. She has driven to Indiana by herself, which is approximately three and one-half to four hours. She drives to visit her sister every four to five months, which is about a 30 minute drive. She was also able to fly to Florida for vacation in April 2007 and July 2008.

> She has a high school education and vocational training in bookkeeping/accounting. She learned the job mostly through on the job train-

3

ing.  She worked until she had a "nervous breakdown" in 2004.  She testified that she did not get medical care at the time and did not require hospitalization.  She described not being able to remember things, breaking down and crying and not being able to perform her job properly.

She indicated that she has mental health treatment in 2005 or 2006 at SouthEast, Inc., but prior to that, her primary care physician would give her medications.  It should be noted that the claimant advised staff that her family doctor and her attorney informed her that she needed to seek counseling.  She also described an episode of suicidal ideation in 1997, but she reported that she had no intent to harm herself and she just took sleeping pills to get some sleep after having difficulty sleeping.

She described being able to stand and/or walk for 30-40 minutes at a time and sit "in a certain chair" for about 45-60 minutes at a time.  If she sits in a "regular" chair, she is only able to sit for 5-10 minutes at a time.  She is able to be on her feet for a total of two and a half hours total in an eight-hour day and sitting for a total of two and a half hours total in an eight-hour day.  This is not entirely consistent with her description of her activities of daily living.  She described being able to lift less than 10 pounds without causing pain.  She is able to pick up a gallon of milk.

(R. 20, 23, citations omitted.)


### Medical Evidence of Record.

Although the administrative law judge's decision fairly sets forth the relevant medical evidence of record, this Report and Recommendation will summarize that evidence in some detail.

### Physical Impairments.

Robert Gewirtz, M.D.  Dr. Gewirtz performed a laminectomy on Plaintiff for a lumbar herniated disc in 2002.  (R. 156.)  At a March 2003 follow-up, Plaintiff

reported that she was doing well with minimal discomfort. (R. 156.) On August 4, 2004, Plaintiff returned for another follow-up. She reported that she had slipped and fallen on her back about a month before, and had suffered severe pain up and down the paraspinous muscles and down the backs of both legs since then. Upon examination, Dr. Gewirtz found Plaintiff's strength excellent in both dorsi and plantar flexion. She had an unremarkable gait and normal, symmetric reflexes. Dr. Gewirtz requested an MRI of her lumbar spine. (R. 156.)

On August 26, 2004, Plaintiff returned to see Dr. Gewirtz. She had obtained an MRI, and reported that her pain remained unchanged. Dr. Gewirtz examined the MRI, finding a small bulge eccentric to the left at L4-5, with a minimal amount of enhancing scar tissue. He concluded that he was "underwhelmed by this small bulge", which was causing only minimal encroachment upon the canal and "[c]learly . . . not a gross herniation." Dr. Gewirtz referred her to a specialist in physical medicine and rehabilitation, recommending additional conservative measures before recommending repeat surgery. (R. 155.)

Jeffrey R. Blood, M.D. On September 16, 2004, Plaintiff saw Dr. Blood, a specialist in physical medicine and rehabilitation, on referral from Dr. Gewirtz. (R. 231-32.) She reported to him episodic pain in her lower back radiating into the left leg, which grew worse if she sat for a long period of time or ascended or descended stairs. (R. 231.) Dr. Blood examined her, finding about 75% of anticipated extension and right and left lateral bending, but at 30 degrees of forward flexion she reported pain radiating into the left posterior gluteal region. (R. 232.) Plaintiff

opted for lumbar epidural steroid injections and physical therapy. (R. 232.)

On November 4, 2004, Plaintiff saw Dr. Blood for a series of steroid injections. (R. 228.) He reported that the first injection seemed to give very pronounced improvement, but subsequent ones gave her diminishing results. She reported overall a 50% reduction in symptoms. Plaintiff stated that she still had difficulty in activities of daily living and ascending stairs. Dr. Blood recommended an increase in Naprosyn regimen, beginning physical therapy, and a TENS unit. Plaintiff apparently provided Dr. Blood with forms relating to a return to work, and he reported recommending light work, with only rare bending, and the ability to get up and walk around at least once every half hour. (R. 228.)

On November 30, 2004, Plaintiff returned to Dr. Blood for a follow-up. She reported that she was "quite pleased" with her progress at physical therapy, and requested that it be extended. Plaintiff stated that her therapy had been so successful that she had never bothered to try the TENS unit, and that when she had run out of Naprosyn she had noticed no changes. Upon physical examination, Dr. Blood found her to have normal strength, sensation, and reflexes in the lower limbs, with normal range of motion. His impressions were that Plaintiff was showing resolution of her lumbar radiculopathy. Dr. Blood recommended that she continue her physical therapy, and then do home exercises, and, in light of her "excellent progress", did not schedule a follow-up appointment. (R. 227.)

Finally, on April 20, 2005, Plaintiff returned to see Dr. Blood. She reported that she had begun use of a TENS unit, and that between it and her daily exercises

6

she was able to control her pain symptoms. Physical examination revealed normal strength and sensation in lower limbs, with very brisk tendon reflexes. Dr. Blood's impressions were that Plaintiff was "doing well" regarding her lumbar radiculopathy, and that thenceforth he would see her on an "as needed" basis. (R. 226.)

Larry T. Todd, Jr., D.O. On March 13, 2006, Plaintiff saw Dr. Todd for an orthopedic spine consultation. (R. 219.) She reported that she had received approximately 40-50% relief from her surgery, but that she had suffered a fall in July 2004 and had suffered back pain ever since in a 6-7/10 intensity. Plaintiff also reported that she had "tried physical therapy in the past and states they have not helped." (R. 219.) Dr. Todd reviewed a recent MRI, which demonstrated some degenerative disc collapse and lateral recess compromise, and lateral recess stenosis at the L4-5 level with a mild disc protrusion at the L4-5 level. (R. 220.) He also reviewed Dr. Blood's record of September 16, 2004, in which he initially diagnosed Plaintiff's left L5 radiculopathy, but apparently not Dr. Blood's subsequent treatment records concerning steroids and physical therapy. (R. 220.)

Dr. Todd provided Plaintiff with information on several treatment options, including physical therapy, steroids, clinical pain management, and surgery. Plaintiff indicated that she was contemplating surgery, but that she would consider the risks and discuss it with her primary care physician. (R. 221.)

On October 10, 2007, Plaintiff returned to see Dr. Todd. She reported still having a lot of pain in her lower back and posterior left lower extremity. (R. 281.) Dr. Todd ordered a new MRI, noting that whether surgical or conservative treat-

ment was appropriate would depend upon the results of the MRI. (R. 282.)

Plaintiff completed her physical therapy program at NovaCare Rehabilitation on April 9, 2008. She had made "excellent" progress on three out of four goals, and "some" progress on one goal. Plaintiff was discharged to an independent home exercise program, which she had established while in physical therapy. (R. 295.)

On April 16, 2008, Plaintiff returned again to see Dr. Todd. Her insurance had denied the request for a new MRI. She reported that she had recently completed five months of physical therapy, and had enjoyed some success in alleviating back and leg discomfort before her progress had plateaued. (R. 279.) Plaintiff claimed that the simple act of getting out of bed or into her car could cause her pain to flare up. Dr. Todd noted that he would attempt again to order a new MRI, to find out whether her pathology had worsened. (R. 280.) He also noted that Plaintiff had reported benefit from daily use of her TENS unit, and recommended its continued use. (R. 280.)

Plaintiff obtained a new MRI on April 28, 2008. It demonstrated mild degenerative disc disease at the L4-5 level where there is disc desiccation and mild disc space narrowing. (R. 286.) At the L4-5 level, the MRI revealed a small diffuse disc osteophyte complex causing mild indentation of the anterior aspect of the thecal sac, but it did not appear to cause central spinal canal stenosis. A small annular fissure was present in the right foraminal region, and there was minimal bilateral foram-inal narrowing. (R. 286.)

Plaintiff again saw Dr. Todd on May 7, 2008. He reviewed her recent MRI,

8

and recommended a comprehensive rehabilitation program including some injections and therapy. (R. 277-78.)

Plaintiff again saw Dr. Todd on July 16, 2008. She reported that, instead of completing arrangements for her rehabilitation program, she had gone on vacation. (R. 275.) Her neurovascular examination was stable and intact, and she reported feeling a little better than the last time. Dr. Todd again recommended conservative measures instead of surgery. (R. 275.)

On August 5, 2008, Plaintiff obtained an MRI. It demonstrated mild discogenic spondylosis and broad-based subligamentous disc protrusion at L4-5, exhibiting minimal left foraminal encroachment without evidence of neural compression, and coexisting degenerative facet arthropathy contributing to mild left-sided foraminal stenosis. (R. 266.) It also demonstrated left-sided extraforaminal disc protrusion at L2-3, resulting in foraminal encroachment without evidence of neural compression. (R. 266.)

Plaintiff returned to see Dr. Todd on August 27, 2008. She reported having been involved in a serious automobile accident on April 30, 2008, which had resulted in worsening back pain and numbness and tingling predominantly on the left leg in the anterior quadrants of her left thigh, which had become worse in July 2008. (R. 272-73.) Dr. Todd stated that he would review the post-accident MRI.

<u>Walter Holbrook, M.D.</u>  On August 29, 2006, Dr. Holbrook, a state agency physician, performed a physical residual functional capacity assessment based upon Plaintiff's medical record. (R. 136-143.) He concluded:

> The clt is a 46 yr old woman with a hx of back pain. She had a lamin-
> ectomy in 2002. MRI done on 02/06 show post surgical changes in good
> alignment and mild disc bulges at L4-L5 and L1-L2 levels. SLR is
> negative, strength is normal, ROM in back is normal in all directions,
> sensation and reflexes are intact.

(R. 137.) Dr. Holbrook opined specifically that Plaintiff could occasionally lift and carry 20 pounds, could frequently lift 10 pounds, could stand, walk, or sit about six hours in an eight-hour workday, and had an unlimited ability to push or pull. (R. 137.) He found no manipulative, visual, communicative, or environmental limita-tions, though he opined that Plaintiff should never climb a ladder, rope, or scaffold, and that she could crawl only occasionally. (R. 138.) Dr. Holbrook determined that Plaintiff's symptoms were attributable to a medically determinable impairment, but that the severity or duration of the symptoms reported was disproportionate to what the record would indicate and was only partially consistent with the medical and nonmedical evidence. (R. 141.)

Scott M. Otis, M.D. On January 12, 2009, Dr. Otis, an orthopedist, saw Plaintiff on referral from Dr. Todd. (R. 358.) Plaintiff reported to him persistent low back pain going across the belt line, with complaints into the left buttocks and radiating into the left anterior thigh, where she had associated parasthesias. She stated that her symptoms were largely brought on by standing, housework, and prolonged walking, and that she was better with medications and changing posi-tions. Plaintiff claimed that she had completed a course of physical therapy, and had had injections performed by Dr. Blood, without benefit. (R. 358.) Dr. Otis discussed performing a left L2 transforaminal epidural injection, as well as a series

of three injections if the first proved helpful.  (R. 360-61.)

On January 16, 2009, Dr. Otis performed the left L2 transforaminal epidural injection.  (R. 362.)  Plaintiff tolerated the procedure well and was discharged.  On February 17, 2009, Dr. Otis performed bilateral L3, L4, and L5 medial branch blocks.  (R. 366.)

Michael J. Simek, M.D.  On February 20, 2009, Plaintiff saw Dr. Simek, a specialist in physical medicine and rehabilitation, for follow-up on the medial branch block injections.  According to Plaintiff, her preoperative pain was a 7/10 in severity, and it diminished to a 0 or 1 for at least four hours after the injections, remaining "somewhat low" for the next few days.  (R. 366.)  On February 20, 2009, reporting her current pain as a 2/10 in severity, and that she was "very satisfied" with her improvement.  "Currently, she does not need to take any pain medication and she is quite pleased with her progress."  (R. 366.)  Physical examination demonstrated that Plaintiff had flexion with her hands to her knees without pain, and extension to 15 degrees without significant pain.  Extension and rotation maneuvers caused mild ipsilateral pain bilaterally.  (R. 366.)  Dr. Simek discussed with Plaintiff performing a second set of diagnostic medial branch blocks, but "as her pain is actually quite under control at this point", he recommended waiting to see if the pain returned and performing the injections then.  (R. 367.)

**Mental Impairments**.

Martin T. Taylor, D.O., Ph.D.  On March 2, 2004, Dr. Taylor, a neurologist,

examined Plaintiff on referral from Dr. Stern. Plaintiff reported problems starting at least six weeks prior, with dizziness, confusion, and beginning to forget things. She stated that she had started a very stressful new job as an accountant the previous May, and that as she had been unable to perform at an acceptable level she had recently been terminated. (R. 222.) Plaintiff reported increased sleeping, without refreshment, and occasional lightheadedness and balance problems.

Dr. Taylor examined Plaintiff, finding her alert, oriented times three, and attentive with normal language and cognition. A coordination exam was normal. She scored thirty out of thirty points on a mini-mental status examination. Finding no objective evidence of significant organic dysfunction and normal recent MRI results, Dr. Taylor concluded that the significant stress over the prior year was the likely cause of her anxiety, depression, and other symptoms. (R. 223.) He recommended psychiatry and counseling, antidepressants, and follow-up neuropsychological testing in case of further memory problems despite treatment for anxiety. (R. 224.)

Ronald D. Kirkpatrick, LISW. On June 3, 2004, Mr. Kirkpatrick, a psychotherapist, prepared a letter for Plaintiff's short-term disability insurance provider. (R. 608-09.) He reported that he had seen Plaintiff approximately once per week since March 2004, and that she was suffering from major depressive disorder, single episode, moderate severity, as a reaction to family stresses and having been downsized from her job. Mr. Kirkpatrick stated that this stress had produced the symptoms of increased sleep, low mood, anhedonia, hopelessness and helplessness, de-

creased self-esteem, decreased memory, decreased concentration, confusion, leth-
argy, headaches, and anxiety. He opined that with short-term treatment she
should be able to return to full-time employment. (R. 608.)

On July 13, 2004, Mr. Kirkpatrick completed a form psychiatric evaluation
for her insurer. (R. 604-06.) He assessed her GAF at 52, with moderate to mild
functional impairment. (R. 605.) He opined that she had moderate impairment in
her activities of daily living and social functioning, and marked impairment in
concentration, persistence, and pace, and her ability to adapt to stressful conditions.
(R. 606.)

Roxanne A. Lewis, Ph.D. On August 8, 2006, Dr. Lewis, a psychologist, con-
ducted a clinical examination of Plaintiff at the request of a state disability deter-
mination agency. (R. 250-252.) Plaintiff complained of depression, with crying and
screaming outbursts and problems with short-term memory. She stated that she
had been hospitalized after a 1997 suicide attempt and had later been on short-term
disability for emotional problems. Upon examination, Dr. Lewis found her to be in
"some distress", and noted that her affect was tearful and sad. Plaintiff reported
frustration and depression all the time, with devastating feelings of guilt. (R. 251.)
Dr. Lewis conducted cognitive function testing, in which Plaintiff was alert and
oriented to time, day, date, and situation, and responded to general information
questions within normal limits. She was able to do simple arithmetic problems
without difficulty, which Dr. Lewis interpreted as indicating that her attention was
within normal limits, although she was not able to count by serial sevens. (R. 251.)

13

Dr. Lewis concluded that Plaintiff had bipolar I disorder primarily depressed, with a GAF of 49. He found her ability to relate to others, including co-workers, moderately impaired, as was her ability to adapt and to sustain concentration and persistence. However, he concluded that her ability to understand and follow instructions was fair, her ability to perform simple repetitive tasks was good, and her ability to withstand the stress and pressures of daily work activity was only mildly impaired. Plaintiff's problems with understanding and memory were in the low average range. (R. 252.)

Patricia Semmelman, Ph.D. On August 24, 2006, Dr. Semmelman, a state agency psychologist, conducted a mental residual functional capacity assessment based upon Plaintiff's medical record. (R. 117-135.) She specifically found that Plaintiff had moderate limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with others without being distracted, accept instructions and respond appropriately to criticism from supervisors, and respond appropriately to changes in the work setting. (R. 117-18.) She opined for purposes of the listings that Plaintiff had the medically determinable impairment of "bipolar disorder primarily depressed vs depression nos", and that Plaintiff suffered from moderate difficulties in her ability to maintain social functioning and concentration, persistence, or pace, and mild restrictions on her activities of daily living. (R. 125, 132.)

Dr. Semmelman found specifically:

The claimant reported on her adl that she did no hhc, yet describes doing them at the CE. On her adl she claims she has blackouts, but no mer shows this. She reports she has been forgetful with memory problems for the last two years, but no mention of this in any of the medical notes. She reports she has mood swings, but the mer does not show this and only notes she is depressed. The notes also do not show her oversleeping. She was concerned that the medication she was taking was too strong because she was getting more depressed and not leaving the house. This implies she had been leaving the house. The notes after this did not discuss any further concerns. She did not do serial 7s, yet worked as an account[ant] for 25 years. This does not appear to be her best effort. Given all this, the claimant is considered to be less than credible.

Dx: bipolar disorder primarily depressed. GAF=49. Somewhat lesser weight has been given to the CE since there is a credibility issue and there is no psych treating source. Clt's statements are considered partially credible. The clt retains the ability to complete routine tasks that do not have a strict production quota.

(R. 119.) On February 5, 2007, Alice Chambly, Psy.D., another state agency psychologist, reviewed and affirmed this assessment. (R. 121.)

Southeast, Inc. On November 7, 2006, Plaintiff went to Southeast, Inc. for a mental health assessment. (R. 258-59.) The intake counselor, Betty Guay, noted that Plaintiff had a flat affect, congruent with depressed and tearful mood. She appeared to have some short term memory trouble, but her judgment and insight were good. Plaintiff reported feeling depressed approximately 22 days out of every month, with anger, irritability, decreased energy, guilt, grief, hopelessness, self-esteem problems, physical pains, stress, and feelings of worthlessness. (R. 258.) She was to begin attending weekly sessions.

Plaintiff was treated at Southeast for depression and anxiety approximately 67 times between January 2007 and July 2009. At a February 22, 2007 session, she

reported that she had been very satisfied with taking Cymbalta and Lamictal, and that she felt like she had "improved significantly" over the past several month, with relief from depressed mood and mood swings. (R. 350.) On March 29, 2007, Plaintiff reported that she was continuing to do well on her medications. (R. 348.) On June 19, 2007, she reported that she had not been sleeping well and that her energy level was poor, with only fair concentration. Plaintiff also reported occasional crying spells and feelings of guilt, and that she had been feeling anxious, although she did not know why. (R. 346.) On January 1, 2008, Plaintiff reported being "very happy" with using Lamictal, and that it was controlling her depression and mood swings. (R. 343.)

**Administrative Law Judge's Findings**. The administrative law judge found that Harlan had the severe impairments of status post laminectomy at level L4-5, status post hysterectomy, obesity, and bipolar disorder. (R. 18.) She concluded, however, that while the medical evidence of record established degenerative disc disease of the lumbar spine, it did not satisfy the criteria of Listing 1.04. Furthermore, the ALJ found that Harlan's mental impairment did not meet or medically equal the criteria of Listing 12.04, concluding that she had no more than mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, and no documented episodes of decompensation. (R. 21.)

The ALJ determined that Harlan maintained the capacity to lift, carry, push,

or pull 20 pounds occasionally and 10 pounds frequently, sit and/or walk for six hours in an eight-hour workday, and sit six hours total in an eight-hour workday. She limited Harlan to simple repetitive tasks in a low stress work environment with only superficial contact with others. (R. 22.) Based upon these stated limitations, the testifying vocational expert concluded that Harlan was unable to perform any of her past relevant work, but opined that a significant number of unskilled light and unskilled sedentary jobs existed which Harlan could still perform. (R. 25-26.) The ALJ adopted this opinion and concluded that Harlan was not disabled. (R. 26.)

**Standard of Review**. Under the provisions of 42 U.S.C. §405(g), "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive. ..." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Company v. NLRB*, 305 U.S. 197, 229 (1938)). It means "'more than a scintilla.'" *LeMaster v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Houston v. Secretary*, 736 F.2d 365, 366 (6th Cir. 1984); *Fraley v. Secretary*, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health,*

*Education and Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1950)); *Wages v. Secretary of Health and Human Services*, 755 F.2d 495, 497 (6th Cir. 1985).

**Plaintiff's Arguments**.  Plaintiff argues that (1) the ALJ erred in omitting a requirement that Plaintiff change positions every half hour from his residual physical functional capacity assessment, which would have limited her to alternating sitting and standing light or sedentary work; and (2) the ALJ erred in disregarding Plaintiff's decreased stress tolerance in making his residual mental functional capacity assessment.

**Analysis**.  Plaintiff argues, in the first place:

> The physical RFC in the decision was based on assessments by State Agency non-examining physicians on 08/29/06 and 02/08/07 finding a physical RFC for a restricted range of light work.  These physicians failed to include in the RFC her need to alternate positions at least every half hour as prescribed by Dr. Blood during his treatment in 2004-05.  She continued with the same complaints at time of the hearing, stating she was able to stand/walk for 30-40 minutes, sit 5-10 minutes in a normal chair, but up to 60-65 minutes in a chair she had at home in which she was particularly comfortable; during an 8 hour workday she was able to stand/walk a total of 2 ½ hours and sit a total of 2 ½ hours.  Yet, the decision failed to include her need to alternate positions in the physical RFC.

(Doc. 14 at 13, citations omitted.)  Plaintiff goes on to argue, citing SSR 83-12 and SSR 96-9p, that the need to alternate positions substantially reduces jobs at the light and sedentary level, and as the physical RFC failed to include this limitation, the vocational expert's analysis was necessarily invalidated.

As the Commissioner points out, however, Dr. Blood's recommendation of a sit-stand option was on November 4, 2004, predating almost any of her treatment. Moreover, Dr. Blood stated that his recommendation was in the context of Plaintiff's immediate return to work. (R. 228.) Over the next three years, Plaintiff underwent further treatment, including physical therapy which, according to Dr. Todd's records, she stated had been helpful in alleviating her symptoms and permitting her to reduce her pharmaceutical pain management, and Dr. Otis' successful administration of branch blocks in January 2009, which she claimed provided significant relief. Substantial evidence therefore supported the ALJ's disregard of Dr. Blood's 2004 recommendation as to her immediate work restrictions.

Furthermore, to the extent that Plaintiff herself claimed that she still required the need to alternate positions, an ALJ is not required to simply accept a claimant's statements as to the severity and effects of her impairments. She may "consider the credibility of a claimant when making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 469, 476 (6th Cir. 2003), citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Although it must be supported by substantial evidence, an ALJ's credibility determination about a claimant is to be given great weight. *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531, citing *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988).

Here, the ALJ specifically considered Plaintiff's credibility:

> Additionally, given the degree of severe pain and disabling limitations the claimant alleges one would expect the claimant to seek more aggressive treatment, greater use of medication and/or a stronger pain-relief medication. The claimant continued to report persistent lumbar pain symptoms; however, a reasonable implication from her conduct is that her condition is manageable with medication and only periodic visits to her orthopedist, so much so that even after the trauma of the motor vehicle accident, she was able to completely avoid recommended therapy and take a vacation.

(R. 24.) The ALJ's credibility determination here was supported by substantial evidence, including Plaintiff's 2008 vacation in lieu of physical rehabilitation (R. 275), conflicting accounts as to whether physical therapy, Dr. Blood's steroid injection, or Dr. Otis' branch blocks had been effective (R. 228, 227, 219, 366), and testimony that she had been able to undertake a lengthy road trip to Indiana (R. 639-640). Another reviewer could have come to a contrary decision concerning Plaintiff's credibility, but the decision of the ALJ here must be upheld if the findings and inferences reasonably drawn from the record are supported by substantial evidence. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Accordingly, the ALJ did not err in failing to include a need to alternate positions in the physical RFC she supplied to the vocational expert.

Plaintiff argues also that the ALJ erred in adopting a mental residual functional capacity assessment which stated that she could perform simple, repetitive tasks in a low stress work environment, with only superficial contact with others. She asserts that "[s]uch a general limitation to 'low stress' work is insufficiently individualized to her condition." (Doc. 14 at 14.) Plaintiff notes that she was

terminated from her last job due to being unable to handle the stress of the position, that the treatment records of her therapist, Ron Kirkpatrick, contained substantial evidence of stress causing various physical and mental symptoms which would inhibit her ability to perform vocational tasks.

However, as noted above, the decision of the Administrative Law Judge will be upheld as long as it is supported by "sufficient evidence". 42 U.S.C. §405(g). "A decision is supported by substantial evidence where a reasonable mind could find that the evidence is adequate to support the conclusion reached. . . even if the court might have arrived at a different conclusion." *Valley v. Comm'r*, 427 F.3d 388, 391 (6th Cir. 2005), citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971) and *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Here, evidence does support Plaintiff's contention that she was subject to considerable stress from family problems, and that this stress adversely affected her ability to hold her prior job and to perform vocational functions such as maintaining concentration and adapting to changing conditions. However, substantial evidence also existed to support the ALJ's conclusion that Plaintiff was capable of working, so long as it were in a low-stress environment. She adopted the 2006 opinion of Dr. Lewis that Plaintiff's ability to withstand the stress and pressures associated with day-to-day work activity appeared to be only mildly impaired, and noted the treatment records from Plaintiff's counseling at SouthEast, Inc., which reflected that her condition generally responded to treatment and was stabilized. (R. 19, 20.) The ALJ further evaluated Plaintiff's credibility, and found that, based upon Plaintiff's

testimony as to her ability to care for her family and undertake activities of daily living, that she had "no more than 'moderate' difficulties in maintaining concentration, persistence, or pace."  (R. 21.)

Another administrative law judge or other evaluator could have, presented with the evidence of record, arrived at a different conclusion as to Plaintiff's ability to withstand the stress of employment.  However, as noted above, the Court must defer to and sustain the ALJ's findings where they are supported by substantial evidence, even if that evidence could have supported a different conclusion.  As the ALJ's findings that Plaintiff could perform simple, repetitive tasks in a low stress work environment were supported by substantial evidence, Plaintiff's assignment of error is not well taken.

**Conclusions**.  For the reasons set forth above, I find that there is no basis to overturn the decision of the Administrative Law Judge.  Accordingly, I **RECOMMEND** that Plaintiff's objections be **OVERRULED**, and that this case be **DISMISSED**.

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties a motion for reconsideration by the Court, specifically designating this Report and Recommendation, and the party thereof in question, as well as the basis for objection thereto.  28 U.S.C. §636(b)(1)(B); Rule 72(b), Fed. R. Civ. P.

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the

District Judge and waiver of the right to appeal the judgement of the District Court. *Thomas v. Arn*, 474 U.S. 140, 150-52 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also*, *Small v. Secretary of Health and Human Services*, 892 F.3d 15, 16 (2d Cir. 1989).

s/Mark R. Abel
United States Magistrate Judge